UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

vs.                                                           Case No. 8:11-CR-401-T-27AEP

RIGOBERTO BAUTISTA-VILLANUEVA
_____/

## ORDER

**BEFORE THE COURT** is Defendant's Motion to Suppress Confession (Dkt. 30) and the Government's opposition (Dkt. 39). Upon consideration of the evidence introduced during the suppression hearing, the motion is GRANTED.

On February 8, 2011, Defendant was arrested and charged by complaint with transporting illegal aliens. The complaint was dismissed on motion of the United States Attorney. On May 2, 2011, Defendant was re-arrested by Border Patrol Agent Robert Vadasz and ICE Agent Jennifer Silliman. After his arrest, Defendant was questioned for approximately three and a quarter hours. The session was recorded by video and audio. It took place in a small room. Defendant sat across a desk from the agents. He was not restrained, was provided with a bottle of water and was allowed a restroom break toward the end of the interview.

Defendant is 38 years old and was born in Honduras. He has lived in the United States for 17 years and has permanent residency status. He was educated in Honduras, an education his sister characterized as "excellent." There was no evidence that he had any involvement with law enforcement before his arrest. During the interview, Defendant appeared healthy and mentally alert.

1

His sister confirmed that he has no mental impairments. Defendant reads and writes Spanish. He speaks fairly good English.

At the beginning of the interview, which was conducted mostly in Spanish, Defendant acknowledged his constitutional rights and that he understood them. The atmosphere of the interview was calm and even somewhat jovial at times. Defendant appeared relaxed, comfortable and did not appear to be in distress. He laughed and bantered with the agents. He was demonstrative and emphatic at times, particularly concerning family matters (Tr. 68-70).[1] Defendant was never physically threatened.

Agent Vadasz conducted most of the interview. Vadasz remained seated across from Defendant. At times, he leaned back and did not appear confrontational or physically threatening. He was polite, assuring Defendant that he was considered only a minor player in a larger alien smuggling conspiracy. As the interview dragged on, and Defendant persisted in denying any involvement in illegal smuggling, Agent Vadasz can be heard raising his voice (Tr. 44; 13:27:02), but not in a way which was unduly coercive or threatening. The tone and demeanor of the agents remained appropriate throughout the interview.

For approximately the first half of the interview, Defendant maintained that he was not involved in alien smuggling and that he had only given rides to "passengers."[2] In response to Defendant's persistent denials that he was involved in alien smuggling, Agent Vadasz became more insistent. Among other things, he told Defendant that "[r]ight now we only have you for minor charges . . . [a]nd we don't want to put the bigger charges on your case, okay." (Tr 28-29). "We

---

[1] "Tr" refers to the transcript of the interview, introduced as Government Exhibits 4A and B.

[2] When originally arrested, Defendant was driving a car with three illegal aliens as passengers.

2

already know that you are connected sir, but we do not believe that you are a coyote, that you are a smuggler, that you are a big criminal.". . . "Okay? But I'm going to change my mind right now. If you are protecting everybody . . ." (Tr. 42-43).

In response to Defendant's protestation that he was not protecting anyone, the agent told him: "Okay, well tell me the truth then because I don't want to send you to jail for the, for the same time as these fuckers." . . . "But tell me why you don't want to tell me the whole truth because I can help you." (Tr. 43). He was told he "could be a witness or a defendant," and "that he could be in jail for a long time, or do you wanna try not to go to jail." These statements undeniably implied that Defendant could avoid being charged, or at the very least, could avoid jail if he confessed.

He was told that he would be treated as a "very bad guy," "a big time guy," and face more serious charges if he didn't tell the truth, and "[i]f you don't tell the truth and accept responsibility you will get more."(Video @ 14:17:15-14:18:55:)[3] He was told it was his "last chance" *to be a witness, "not part of the conspiracy."* (Tr. 58). At one point, the agent had Defendant hold his hands out, pointing out that his heart rate was high, apparently suggesting that they could tell he was nervous and not telling the truth (Tr. 64). And when Defendant denied knowing an individual the agent identified as "Bori" or that "Bori" had given him a particular phone number, the agents indicated that "[i]t's all recorded. There's cameras and microphones." (Tr. 66).

At some point, however, Defendant's will broke and he admitted his involvement in alien smuggling. That began to occur after this particular exchange, beginning at page 86 of the transcript:

---

[3] After being told that individuals he had transported had identified him, Defendant maintained his innocence ("Because I, the truth is, what can I tell you? I'm innocent. Well if they accuse me of what you say, that I am a smuggler well, I can't say anything." The agents persisted, telling him: "How many time do I have to explain that you are not a smuggler? . . . Eventually we are going to believe you are a smuggler. Right now sir I believe you don't want any problems." (Tr. 50 -51).

3

UM1: "Any idea how, do you, do you, are you happy in Honduras? Are you happy in jail?

RIGOBERTO: No

UM1: You're not happy in jail, right?

RIGOBERTO: I'm not happy in jail, no.

UM1: Do you wanna go start a family in Honduras? Do you have a girlfriend now? A wife? Do you wanna go find one in Honduras and live there happily ever after, and make babies in Honduras, *or do you wanna stay in America?*

RIGOBERTO: I love to.

UM1: You wanna go to jail for a long time *or do you wanna try and not go to jail?*

RIGOBERTO: I would love to not to go to jail.

UM1: Well, I can tell you right now.

RIGOBERTO: [U/I]

UM1: Okay, well, I tell you what. You got an opportunity right now. I can't promise you anything, what I can promise you, if you don't start telling the truth right now you will go to jail. You will get deported as an aggravated felon. You will not ever live in the United States ever again. You will spend years in jail if you do not [U/I]. I'm telling, I'm telling you, I'm mad."

RIGOBERTO: Mmm-hmm.

UM1: "I, unless you start right now telling the truth, I swear to you, I promise to god on my mother's grave that will happen. You will serve time in prison, you will be an aggravated felon, you will lose your MICA [PH], you will be deported to Honduras, and you will never be able to come back here ever again after serving years in prison.

RIGOBERTO: Mmm-hmm.

4

UM1: That will happen starting tomorrow morning.

RIGOBERTO: That's true.

UM1: Whatever! You can start right now and just tell us the truth to what's going on, and then we can go in front of the judge and go 'you know what, judge? The guy made a mistake. The guy's house's in foreclosure, his wife left him.' Did you tell him that?

RIGOBERTO: Mmm-hmm.

UM1: I can tell him you're having a bad time and you made a bad decision.

RIGOBERTO: [U/I] that's what I mean.

UM1: That's fine.

RIGOBERTO: [U/I] bad decisions.

UM1: I'll, I'll do it. I'll stand in front of the judge and tell him you made a bad decision.

RIGOBERTO: Mmm.

UM1: If you can stand up for me right now and tell me, show us that you're a stand-up guy, that you're not a criminal, that you're not a scumbag, criminal like the rest of these guys. If you show us right now that you got a heart of a good person than we'll stand up for you in court. Am I wrong?

UF1: No, I'll do it.

UM1: I'll stand up in front of the judge and I'll swear on the bible.

RIGOBERTO: Mmm-hmm.

UM1: But if you continue this crap right now then we're not gonna do that, at least I'm not gonna do that.

RIGOBERTO: *And, and what is it that you want to know then?"*

Shortly after this exchange, and in response to Defendant's denial that he transported aliens

5

they falsely represented to Defendant that his vehicles were equipped with GPS units, and that the agents had the GPS records from rental car companies showing where he had been "every minute of every day." (Tr. 91). Still not convinced Defendant was being forthright, the agents threatened him with the maximum sentence if he didn't "tell us the truth" (Tr. 91). They followed that by telling him, in apparent reference to acceptance of responsibility under the sentencing guidelines, "[a]ccept responsibility and you tell the truth, you immediately get less. . . . . That's what the law says, and if you don't accept responsibility and you don't tell the truth you immediately get more." (Tr. 92).

At this point, Defendant began confessing (Tr. 95-96), to which the agent responded, "Cool man. Now we're talking. I'm not gonna hit you." (Tr. 97). Although this last statement was jokingly made, the point is that the agent acknowledged that Defendant had finally begun to acknowledge his involvement. In sum, Defendant's confession came only after he had been lied to, threatened with immediate detention, the maximum sentence, and deportation, and only after he had been told he could avoid jail, stay in the United States and be a witness rather than a defendant, if he told the truth.

Defendant admitted to having picked up "passengers" after being called by Guerra or an associate of Guerra, and being paid by the "passengers." (Tr. 95-99). He described how the calls were made, where he picked up the passengers, and the number of trips he recalled making (Tr, 98-113). Apparently still not satisfied, the agents repeated their threat that he would "go to jail tomorrow if you don't start telling us the truth," implying that he would not go to jail if he confessed (Tr. 118), and resorted to lying about having Defendant on video being paid for smuggling (Tr. 125-126)("I got video at a Seven Eleven (7-11) of a lady hand you six hundred and fifty (650) dollars.

I have the bank receipt where she put up six hundred and fifty (650) dollars, and I have her name in your book. Do you understand me?").

Although apparently confused by the claim that the agents had the Seven Eleven video ("Okay, mmm-hmm. Yeah, she gave me six hundred (600) dollars, supposedly. That's what you say, right?), Defendant admitting to having transported a family from Houston to Florida, attempting to explain that he may have been paid $ 600 for multiple passengers. Ultimately, Defendant admitted to having transported up to 50 people at the request of an individual known as Guerra.

As has been observed, "one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled." *Colorado v. Spring*, 479 U.S. 564, 576, (1987). Nonetheless, a suspect's decision to forego his rights and answer questions must be shown to have been voluntary and free from coercion. *Id.* In order for a defendant's incriminatory statements to be admissible, the government must prove by a preponderance of the evidence that the defendant made a knowing, voluntary and intelligent waiver of his *Miranda* rights. *United States v. Farris*, 77 F.3d 391, 396 (11th Cir.1996).

"Misleading a suspect about the existence or strength of evidence against him does not by itself make a statement involuntary." *United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010). While deception will not in and of itself overcome the will of a defendant, *United States v. Farley*, *supra*, it is nonetheless a relevant consideration. *Frazier v. Culp*, 394 U.S. 731, 739 (1969). Additionally, promises of leniency or threats of additional charges is a recognized form of psychological coercion. *United States v. Walton*, 323 Fed. Appx. 837, 841 (11th Cir. 2009). Likewise, considering Defendant's permanent resident status, the threat of deportation and the suggestion that by cooperating, Defendant could remain in the United States, was another coercive

factor bearing on whether his will was overborne. And by implying that Defendant could avoid jail altogether, or face the maximum time in prison from the tougher Tampa court, the agents added to the coercive pressure.[4]

An assessment of whether a defendant's statements are voluntary is determined from the totality of the circumstances. *United States v. Walton* 323 Fed. Appx. at 841. A statement is not voluntary if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence." *Id.* The test is whether the defendant's will was overborne. *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). As has been succinctly stated in this Circuit:

> "The Fifth Amendment prohibits the use of an involuntary confession against a defendant in a criminal trial." *United States v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005), *cert. denied*, 549 U.S. 1087, 127 S.Ct. 748, 166 L.Ed.2d 579 (2006). "We focus our voluntariness inquiry on whether the defendant was coerced by the government into making the statement: The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Id.* (internal quotations and citations omitted). In assessing voluntariness, the district court must consider the totality of the circumstances in assessing whether police misconduct was causally related to the confession. *Id.*

*United States v. Vallas*, 218 Fed. Appx. 877, 879 (11th Cir. 2007).

It is apparent, and the Court so finds, that Defendant admitted his involvement in alien smuggling only after being told that if he did not tell the agents the truth, he would go to prison for the maximum sentence and would be deported after serving his sentence, but that he could avoid jail, avoid being charged, be only a witness, and would be able to stay in the United States if he "told the

---

[4] "You are going to remain detained. You are going to be tried for all this shit. That is the difference. In Jacksonville, they did not make a case against you. In Tampa, the law is much tougher. They do not play here in Tampa. . . Its much tougher in Tampa (Tr. 51).

8

truth." The agent's isolated statement to Defendant that he "can't promise you anything" cannot be viewed in isolation. From the perspective of the totality of the circumstances, that statement was effectively rendered meaningless, as it was overshadowed by the repeated threats of a maximum sentence and deportation if Defendant didn't tell the truth, and the repeated assurances that by telling the truth, he could be just a witness, avoid serious jail time and stay in the United States.

Based on the totality of the circumstances, I find that Defendant's will was overborne by these threats, the deceit used by the agents, and their promises of leniency. Defendant's admissions were coerced and thereby rendered involuntary. For these reasons, Defendant's Motion to Suppress Confession (Dkt. 30) is GRANTED. The Government is precluded from introducing Defendant's admissions and confession as evidence.

**DONE AND ORDERED** this __19th__ day of October, 2011.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record